# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

11-101 (PGS)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF CALIFORNIA,<br>STATE OF DELAWARE,<br>STATE OF FLORIDA,<br>STATE OF GEORGIA,<br>STATE OF HAWAII,<br>STATE OF ILLINOIS,<br>STATE OF INDIANA,<br>STATE OF LOUISIANA,<br>COMMONWEALTH OF<br>MASSACHUSETTS,<br>STATE OF MICHIGAN,<br>STATE OF NEVADA,<br>STATE OF NEW HAMPSHIRE,<br>STATE OF NEW JERSEY,<br>STATE OF NEW MEXICO,<br>STATE OF NEW YORK,<br>STATE OF OKLAHOMA,<br>STATE OF RHODE ISLAND,<br>STATE OF TENNESSEE,<br>STATE OF TEXAS,<br>COMMONWEALTH OF VIRGINIA,<br>STATE OF WISCONSIN,<br>and DISTRICT OF COLUMBIA,<br>*ex rel.*<br><br>[UNDER SEAL],<br><br>    Plaintiffs,<br><br>    v.<br><br>[UNDER SEAL],<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)** |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF CALIFORNIA,<br>STATE OF DELAWARE,<br>STATE OF FLORIDA,<br>STATE OF GEORGIA,<br>STATE OF HAWAII,<br>STATE OF ILLINOIS,<br>STATE OF INDIANA,<br>STATE OF LOUISIANA,<br>COMMONWEALTH OF<br>MASSACHUSETTS,<br>STATE OF MICHIGAN,<br>STATE OF NEVADA,<br>STATE OF NEW HAMPSHIRE,<br>STATE OF NEW JERSEY,<br>STATE OF NEW MEXICO,<br>STATE OF NEW YORK,<br>STATE OF OKLAHOMA,<br>STATE OF RHODE ISLAND,<br>STATE OF TENNESSEE,<br>STATE OF TEXAS,<br>COMMONWEALTH OF VIRGINIA,<br>STATE OF WISCONSIN,<br>and DISTRICT OF COLUMBIA,<br>*ex rel.*<br><br>JOHN D'ALESSIO, M.D.,<br>ALEXANDER FISHER, M.D., and<br>HEATHER HAGERMAN, M.D.,<br><br>      Plaintiffs,<br><br>      v.<br><br>VANDERBILT UNIVERSITY,<br>VANDERBILT UNIVERSITY<br>MEDICAL CENTER, and<br>THE VANDERBILT MEDICAL<br>GROUP AND CLINIC,<br><br>      Defendants. | **COMPLAINT<br>FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)** |

1

## COMPLAINT

On behalf of the United States of America, the State of California, the State of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Louisiana, the Commonwealth of Massachusetts, the State of Michigan, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of New York, the State of Rhode Island, the State of Oklahoma, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Wisconsin, and the District of Columbia (collectively the "States"), Plaintiffs and Relators John D'Alessio, M.D., Alexander Fisher, M.D., and Heather Hagerman, M.D. file this *qui tam* Complaint against Defendants Vanderbilt University, the Vanderbilt University Medical Center ("VUMC"), and the Vanderbilt Medical Group and Clinic ("VMG") (collectively "Defendants" or "Vanderbilt") and allege as follows:

## SUMMARY OF THE ALLEGATIONS

1.     This is an action to recover treble damages and civil penalties on behalf of the United States of America in connection with Vanderbilt's scheme to maximize income from its medical practices by submitting false claims to federal and state health insurance programs for physician services that Vanderbilt knows do not meet Medicare's billing conditions for such services.

2.     Vanderbilt holds VUMC out to the public and the Government "as a leader . . . in patient care throughout the Southeast and the nation over the course of its 135-year history." Vanderbilt further describes VUMC as "a principal referral center for physicians and patients," and reports that in 2009 alone, "the Vanderbilt clinics had over 1,266,000 patient visits, and more than 51,600 patients were admitted to the Vanderbilt hospitals." Vanderbilt touts that its hospitals and clinics "consistently rank among the premier health-care facilities in the United States."

3.     Under Medicare Part A, the teaching hospital at VUMC receives payments from the

2

United States Government for a substantial portion of its residents' training and salaries through direct and indirect graduate medical education payments. Vanderbilt also makes claims for payments under Medicare Part B for services performed by its teaching physicians as supervisors of such residents.

4. As Vanderbilt is aware, it is not permitted to submit claims for payment of teaching physician services under Medicare Part B unless the physician's services satisfy Medicare's rules for teaching physicians, including a requirement that the physician must be present during the key portion of any service, and in the case of surgery or anesthesia, present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. Further, Medicare Part B pays for medically directed anesthesia services only when the physician anesthesiologist satisfies and documents seven key criteria of such service.

5. Nevertheless, since as early as 2003, Relators have personally observed that Vanderbilt engages in day-to-day scheduling and staffing practices that are designed in such a way that it is impossible for Vanderbilt to satisfy the requirements for billing those attending physician services to Medicare. In fact, Vanderbilt physicians are not present during the critical portions of many of their procedures or immediately available to furnish services during the entire procedure. Further, Vanderbilt attending physicians almost never satisfy all of the conditions for medically directed anesthesia services.

6. In numerous surgical specialties across Vanderbilt, including operating rooms in Urology, Orthopedics, Thoracic Surgery, General Surgery, Trauma, ENT/Otolaryngology, and Neurosurgery, Vanderbilt's scheduling and staffing policies force surgeons to routinely overbook their schedules and rely on residents to perform the critical portions of many of their procedures. As Vanderbilt is aware, many surgeons' routine practice is to simultaneously schedule multiple surgeries in multiple locations throughout the day (at least 50% of the time for certain surgeons). Vanderbilt is

3

also aware that it is impossible for its surgeons to perform the critical portions of such simultaneously scheduled procedures or to be immediately available during all portions of those procedures as required for reimbursement under Medicare Part B.

7. Further, in Vanderbilt's Intensive Care Units ("ICUs"), including the Burn Intensive Care Unit ("Burn ICU"), the Neuro-Intensive Care Unit ("Neuro ICU"), the Surgical Intensive Care Unit ("Surgical ICU"), the Trauma ICU, and the Cardiovascular Intensive Care Unit ("CVICU"), attending physicians are often unavailable to participate in procedures on weekday afternoons, nights, and weekends. On weekday afternoons, attending physicians are often tasked with hospital administrative responsibilities, and are therefore unavailable to participate directly in procedures. On nights and weekends, attending physicians "on call" are rarely physically present (at most attending physicians are present 10% of the time between 7pm and 7am). At such times, it is standard practice at Vanderbilt for a Critical Care Fellow (*i.e.*, a fellowship trainee) to perform the role of attending physician. If a fellow is unavailable, residents are required to treat the patients unsupervised.

8. In the case of anesthesia services, in both operating rooms and off-site locations, attending physicians are typically not available to perform many of the steps required to medically direct such services, and nearly 100% of the time do not perform at least one of the following steps, all of which are required for services to be considered "medically directed" by Medicare: (a) perform a pre-anesthetic examination and evaluation, (b) personally participate in the most demanding aspects of the anesthesia plan, (c) monitor the anesthesia at frequent intervals, (d) remain physically present and available for immediate diagnosis and treatment of emergencies, and (e) provide indicated post-anesthesia care.

9. Vanderbilt's systematic practice of understaffing its attending physicians (while at the same time falsely billing for their services) reflects nothing short of Vanderbilt's institutional

4

abandonment of its patients, doctors in training, and nurses. In some instances, the absence of attending physicians in Vanderbilt's operating rooms and ICUs has placed its patients' lives at unnecessary risk. Further, when unsupervised residents perform care independently of attending physicians, Vanderbilt is not permitted to submit claims to the Government for the unreduced physician fee schedule rate because such claims do not meet the billing conditions of Medicare Part B. Indeed, any payments to Vanderbilt under Medicare Part B would give Vanderbilt a substantial windfall because it has already been paid for resident services under Medicare Part A.

10.     However, Relators have personally observed that Vanderbilt routinely submits false claims to federal and state health insurance programs that do not reflect its actual physician services, but rather falsely represent to the Government that Vanderbilt's attending physicians are present for, perform, or direct procedures when they have had minimal, if any, involvement in those procedures. In this way, Vanderbilt is cutting its costs to provide medical services while maintaining revenue by falsifying its billing.

11.     Specifically, Relators have personally observed Vanderbilt conduct the following routine and systematic false claim practices:

a.   Since at least 2003, Vanderbilt has routinely submitted and continues to routinely submit false claims for the services of attending physicians in operating rooms, including in the specialties of Urology, Orthopedics, Thoracic Surgery, General Surgery, Trauma, ENT/Otolaryngology, and Neurosurgery, when Vanderbilt knows that its surgeons are routinely unavailable to perform the critical portions of the procedure and are not immediately available during all portions of those procedures (at least 50% of the time for certain surgeons).

b.   Since at least 2003, Vanderbilt has routinely submitted and continues to routinely

5

submit false claims for the critical care services of attending physician surgeons and anesthesiologists in its ICUs, including the Burn ICU, Neuro ICU, Surgical ICU, Trauma ICU, and CVICU, when Vanderbilt knows that those services were not performed by attending physicians but by unsupervised medical residents (at least 50% of the time).

c. Since at least 2003, Vanderbilt has routinely submitted and continues to submit false claims for "medically directed" anesthesia services even though it knows that those services do not meet the criteria for medical direction nearly 100% of the time.

12.     Relators and other physicians have brought these management and billing issues to Vanderbilt's attention throughout their work at Vanderbilt. Indeed, these false billing issues raised such alarm that Relator Dr. D'Alessio felt compelled to raise his concerns to Vanderbilt's management, including by cautioning them that Vanderbilt patients were receiving "shoddy treatment" and that Vanderbilt's billing practices were "ethically wrong, and more so, illegal."

13.     In addition, in 2008, Vanderbilt conducted an internal audit which found that many of the issues raised by Relators indeed existed with respect to Vanderbilt's billing and documentation practices. Upon learning of these results, Vanderbilt had an obligation to remedy these issues and pay back the Government for its improper claims. Instead, Vanderbilt found ways to cover up and continue these practices, including by designing, creating, and implementing proprietary electronic record systems that allow Vanderbilt to control the flow of information relating to its billing and documentation practices and to produce documentation supporting its false claims.

14.     Vanderbilt goes to great lengths to maintain the fiction that its false billings are justified, including by at least the following pertinent examples:

6

a. Vanderbilt trains and encourages residents to prepare false post-treatment records which indicate the presence of an attending physician in ICUs, when in fact such physicians are not present. Indeed, Vanderbilt's electronic record keeping programs provide default post-treatment records requiring an attestation to the fact that attending physicians are present for all ICU procedures.

b. Vanderbilt designed, created, and maintains electronic billing and record keeping systems which provide template treatment records to support Vanderbilt's false billing practices. For example, to document anesthesia services, Vanderbilt's software provides physicians with only one choice for describing the level of treatment: "medically directed." The software does not permit physicians to select an alternative, lower paying level of service, such as "medical supervision," even though Vanderbilt's treatment of patients almost never meets all of the necessary criteria for medical direction.

15.     Further, in the numerous instances when employees have questioned Vanderbilt's failure to provide adequate and proper staffing of attending physicians or when employees have refused to participate in Vanderbilt's false billing scheme, Vanderbilt has simply dismissed or removed the employees, including notably Relators Dr. D'Alessio and Dr. Fisher.

16.     In summary, from at least 2003 and continuing to the date of this filing, Vanderbilt has presented and continues to present false and fraudulent claims to federal and state health insurance agencies reflecting the presence, supervision and direction of attending physicians for certain claimed medical services, despite the fact that Vanderbilt knows that its attending physicians were not present, supervising, or directing those services as it represented to the Government, and as is required for payment. All such claims presented to the United States Government for payment

7

violate the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*.

17.     Relator Dr. Fisher also asserts a related claim on his own behalf pursuant to 31 U.S.C. § 3730(h) for unlawful retaliation and seeks appropriate statutory penalties and relief under that section.

18.     This is also an action to recover double and treble damages and civil penalties on behalf of the named States arising from the conduct of Defendants who made false or fraudulent claims, statements and records relating to payments made by health insurance programs funded by these State governments, including Medicaid. The statutes of the States under which Relators bring these related actions are the:

     a.  California False Claims Act, Cal. Govt. Code §§ 12651 et seq.;

     b.  Delaware False Claims and Reporting Act, Del Code Ann. tit. 6, §§ 1201 et seq.;

     c.  Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 et seq.;

     d.  Georgia False Medicaid Claims Act, Ga. Code. Ann. §§ 49-4-168.1 et seq.;

     e.  Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 et seq.;

     f.  Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§ 175/1 et seq.;

     g.  Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 et seq.;

     h.  Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:439.1 et seq.;

     i.  Massachusetts False Claims Law, Mass. Gen. Laws ch. 12, §§ 5A et seq.;

     j.  Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 et seq.;

     k.  Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 et seq.;

l.  New Hampshire False Claims Act, N.H. Rev. Stat. Ann. §§ 167:61-b;

m.  New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 et seq.;

n.  New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 et seq., and New Mexico Fraud Against Tax Payers Act, N.M. Stat. Ann. §§ 44-9-1 et seq.;

o.  New York False Claims Act, N.Y. State Fin. Law §§ 187 et seq.;

p.  Oklahoma Medicaid False Claims Act, 63 Okla. St. Ann. §§ 5053 et seq.;

q.  The State False Claims Act (Rhode Island), R.I. Gen. Laws §§ 9-1.1-1 et seq.;

r.  Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 et seq.;

s.  Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.002;

t.  Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 et seq.;

u.  Wisconsin False Claims for Medical Assistance Law, Wisc. Stat. § 20.931; and the

v.  District of Columbia False Claims Act, D.C. Code Ann. §§ 2-308.03 et seq.

## PARTIES

19.  Relator Dr. John D'Alessio is an anesthesiologist who practices and resides in the State of Connecticut.

20.  Dr. D'Alessio was employed by Vanderbilt from 2002 to 2006. During that time, he practiced as an attending physician anesthesiologist. Dr. D'Alessio also served as an Associate Professor of Anesthesiology, Director of Trauma Anesthesia, Director of Acute Pain Management and Regional Anesthesia, and Director of Vanderbilt Orthopedic Surgery Center. While at Vanderbilt, Dr. D'Alessio also developed an Acute Pain Management and Regional Anesthesia Service.

21.  Relator Dr. Alexander Fisher is an anesthesiologist and intensivist who practices and resides in the State of California.

9

22.     Dr. Fisher was employed by Vanderbilt from 2003 to 2008. He practiced as an Anesthesia Critical Care Fellow between 2003 and 2004. From 2004 to 2008, he practiced as an Assistant Professor within Vanderbilt's Anesthesia and Critical Care Department serving as an attending physician in the Neuro and Burn ICUs supervising residents in the care of critically ill patients. During this interval he also worked as an anesthesiologist supervising residents, Certified Registered Nurse Anesthetists ("CRNAs"), and Student Registered Nurse Anesthetists ("SRNAs") in the operating rooms for numerous specialties. From 2005 to 2008, Dr. Fisher served as a director of the Anesthesia and Critical Care Department's Morbidity and Mortality Conference, where he was responsible for ongoing assessment of quality of care issues within the entire anesthesia and critical care department.

23.     Relator Dr. Heather Hagerman is an anesthesiologist who practices and resides in the State of California.

24.     Dr. Hagerman was employed by Vanderbilt from 2003 to 2008. She began working at Vanderbilt as an intern in 2003, and then as a resident from 2004 to 2007. Following the completion of her residency training, Dr. Hagerman practiced as an Assistant Professor within Vanderbilt's Anesthesia and Critical Care Department until she separated from Vanderbilt in 2008. During that time, she supervised residents, CRNAs, and SRNAs in the operating rooms for multiple surgical specialties and served as attending physician for the acute pain service, where she supervised residents performing epidurals, spinals, neuraxial blocks and other out of operating room pain procedures.

25.     Defendant Vanderbilt Medical Group is part of VUMC, and provides a full range of diagnostic and treatment services. VMG's main office is located at 1301 Medical Center Drive in Nashville, Tennessee.

10

26.     VMG has more than 1,200 physicians on staff, comprising over 95 outpatient specialty practices located on Vanderbilt's campus and in off-campus locations in Tennessee and Kentucky.

27.     Defendant Vanderbilt University Medical Center is a collection of hospitals and clinics, as well as schools of medicine and nursing, that are associated with Vanderbilt University. Its principal offices are located at 1211 Medical Center Drive, Nashville, Tennessee. VUMC also operates over 50 satellite clinics in Tennessee and neighboring Kentucky.

28.     VUMC describes itself as being dedicated to patient care, research, and biomedical education, and as a major patient referral center for the Mid-South. According to VUMC, "[e]ach year, people throughout Tennessee and the Southeast choose Vanderbilt for their health care needs."

29.     Defendant Vanderbilt University is a private research university, wholly governed by an independent, self-perpetuating Board of Trust. It is located in Nashville, Tennessee.

30.     VUMC is a component of Vanderbilt University.

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. §§ 3732(a).

32.     Venue is proper in the District of New Jersey under 31 U.S.C. §§ 3732 and 28 U.S.C. §§ 1391(b) and (c) because the Defendants transact business in this District; among other things, New Jersey residents have received patient care at Vanderbilt facilities.

33.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders.

11

34.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relators must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in their possession contemporaneous with the filing of the Complaint. Relators have complied with this provision by serving copies of this Complaint upon the Honorable Paul J. Fishman, United States Attorney for the District of New Jersey, and upon the Honorable Eric H. Holder, Attorney General of the United States.

35.     Relators are not aware that the allegations in this Complaint have been publicly disclosed. Further, to the extent Relators are aware of any public disclosures, this Complaint is not based on such public disclosures. In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relators are an "original source" because they have provided their information voluntarily to the Government before filing this Complaint, and have knowledge which is both direct and independent of any public disclosures to the extent they may exist.

## FEDERALLY FUNDED HEALTH INSURANCE PROGRAMS

### A.     Medicare

#### i.     Medicare Background

36.     Medicare is a federally-funded health insurance program for the elderly and persons with certain disabilities, providing both hospital insurance, Medicare Part A, which covers the cost of inpatient hospital services and post-hospital nursing facility care, and medical insurance, Medicare Part B, which covers the cost of the physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician.

37.     Medicare payments come from the Medicare Trust Fund, which is funded primarily by payroll deductions taken from the United States work force through mandatory Social Security deductions.

38.     Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services. CMS establishes rules for the day-to-day administration of Medicare. CMS contracts with private companies to handle day-to-day administration of Medicare.

39.     CMS, through contractors, maintains and distributes fee schedules for the payment of physician services. These schedules specify the amounts payable for defined types of medical services and procedures.

40.     Hospitals generally are reimbursed under Medicare Part A on a reasonable cost basis for services provided to Medicare beneficiaries. Resident salaries are included among the costs for which hospitals are reimbursed under Part A. Thus, services provided by residents typically cannot be billed under Medicare Part B.

41.     Since Vanderbilt is an academic hospital, it is eligible to be reimbursed for the teaching activities of clinical faculty physicians (also referred to herein as "attending physicians" or "teaching physicians"). Teaching hospitals may also properly bill under Medicare Part B for medical services of attending physicians in limited circumstances where the attending physician is directly involved in providing patient services.

### ii.     Medicare's Payment for Services of Attending Physician Surgeons in a Teaching Setting

42.     In order to receive payment for services performed by physicians in a teaching setting, the service must meet one of the following two criteria: (a) the services are personally furnished by a physician who is not a resident; or (b) the services are furnished by a resident in the presence of a teaching physician. 42 C.F.R. 415.170.

43.     If a resident participates in a service furnished in a teaching setting, the service is eligible for a physician fee schedule payment "only if a teaching physician is present during the key

13

portion of any service or procedure for which payment is sought." 42 C.F.R. 415.172.

44.     In the case of surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. *Id.* According to the Medicare Claims Processing Manual, "[d]uring non-critical or non-key portions of the surgery, if the teaching surgeon is not physically present, he/she must be immediately available to return to the procedure, *i.e., he/she cannot be performing another procedure.*" Medicare Claims Processing Manual (Rev. 2044, 09-03-10) (emphasis added).

45.     When a teaching physician is not present during non-critical or non-key portions of the procedure and is participating in another surgical procedure, "he/she must arrange for another qualified surgeon to immediately assist the resident in the other case." *Id.* In the case of three concurrent surgical procedures, "the role of the teaching surgeon (but not anesthesiologist) in each of the cases is classified as a supervisory service to the hospital rather than a physician service to an individual patient and is not payable under the physician fee schedule." *Id.*

46.     Further, the claimant must maintain medical records that "document the teaching physician was present at the time the service is furnished." 42 C.F.R. 415.172. For example, the presence of the teaching physician during procedures may be demonstrated by the notes in the medical records made by a physician, resident, or nurse. *Id.* In the case of evaluation and management procedures, the teaching physician must personally document his or her participation in the service in the medical records. *Id.*

### iii.     Medicare's Payment for the Services of Attending Physician Anesthesiologists in a Teaching Setting

47.     Medicare provides for the services of anesthesiologists to be paid based upon three main rates: (1) personally performed, (2) medically directed, or (3) medically supervised.

14

48.     The personally performed rate entitles the physician to claim an unreduced physician fee. It applies where the physician personally performs the anesthesia services, or monitors the work of a CRNA, Anesthetist Assistant, or resident on a one-to-one basis. 42 C.F.R. 415.172.

49.     To qualify for the personally performed rate, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. *Id.* The teaching physician cannot receive an unreduced fee if he or she performs services involving other patients during the period the anesthesia resident is furnishing services in a single case. *Id.* The claimant must maintain documentation that indicates the teaching physician's presence during all critical or key portions of the anesthesia procedure and the immediate availability of another teaching anesthesiologist. *Id.*

50.     The "medically directed" rate applies where the physician is directing two, three, or four anesthesia cases being performed by CRNAs, Anesthesia Assistants, or residents.

51.     Medicare permits payment for anesthesia services at the "medically directed" rate if and only if the physician's services meet the following seven conditions:

> i)      Performs a pre-anesthetic examination and evaluation;
>
> ii)     Prescribes the anesthesia plan;
>
> iii)    Personally participates in the most demanding aspects of the anesthesia plan including, if applicable, induction and emergence;
>
> iv)     Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified individual as defined in operating instructions;
>
> v)      Monitors the course of anesthesia administration at frequent intervals;
>
> vi)     Remains physically present and available for immediate diagnosis and

15

treatment of emergencies; and

vii)   Provides indicated post-anesthesia care.

42 C.F.R. 415.110 (a).

52.   The physician alone must document and attest in the patient's medical record that the seven conditions have been satisfied, "specifically documenting that he or she performed the pre-anesthetic exam and evaluation, provided the indicated post-anesthesia care, and was present during the most demanding procedures, including induction and emergence where applicable." 42 C.F.R. 415.110 (b).

53.   Medicare regulations further permit a provider to bill a service as "medically directed" only if the physician is directing anesthesia services in no more than four concurrent cases. 42 C.F.R. 415.110 (a). If the physician is directing a student nurse anesthetist in any of the cases, the physician may not direct more than two cases concurrently. 42 C.F.R. 414.46(d).

54.   The "medically supervised" rate applies where the physician is either directing more than four concurrent procedures or is performing other services while directing four or fewer procedures.

55.   The Medicare program requires that Part B claims for anesthesia services be submitted using the American Medical Association's Current Procedural Terminology ("CPT") Codes. Claimants are required to provide accurate CPT Codes on all claims submitted for payment, including as follows:

a. For anesthesia services personally furnished by an anesthesiologist, including services provided by faculty anesthesiologists involving a resident, the physician uses the "AA" modifier. Medicare provides payments at the unreduced physician fee rate. For certain produces, a CRNA can also claim anesthesia services

16

performed by the CRNA without the medical direction of a physician using the "QZ" modifier.

b.  For anesthesia services performed when an anesthesiologist and CRNA are involved in a single procedure and the physician is performing the medical direction, the physician uses the "QY" modifier and the CRNA uses the QX modifier. Further, for medical direction by a physician of two, three, or four concurrent anesthesia services, the physician uses the QK modifier.

c.  For medical supervision by a physician of more than four concurrent anesthesia services, the claimant uses the AD modifier, which provides for payment below what is provided for medically directed anesthesia services.

### iv.  Medicare's Payment for Critical Care Services in ICUs

56.     Claimants are eligible to receive Medicare payment for the services of an intensivist (*i.e.*, an ICU physician, usually an anesthesiologist or surgeon, trained in providing Critical Care Services).

57.     Critical Care Services are defined as "the care of the critically ill or unstable injured patient who requires constant physician attendance . . . ." Charges for critical care services are based entirely on the amount of time an intensivist spends in constant attendance with the patient.

### B.    Medicaid

58.     Medicaid is a public assistance program which provides payment of medical expenses for low-income individuals. Funding for Medicaid is shared between the federal government and state programs that choose to participate in Medicaid.

59.     In Tennessee, the Medicaid program is funded by 50% federal funds and 50% state funds.

17

60.     At all relevant times to the Complaint, applicable Medicaid regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

## C.     TRICARE

61.     TRICARE is a federal program which provides civilian health benefits for military personnel, military retirees, and their families. TRICARE is administered by the Department of Defense and funded by the federal government.

62.     At all relevant times to the Complaint, applicable TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

63.     Medicare, Medicaid, and TRICARE, and other similar federal programs are referred to collectively herein as "federal health insurance programs."

## VANDERBILT'S FALSE BILLING SCHEME

64.     From at least 2003 to the filing of this Complaint, Vanderbilt and its officers, agents, and employees engaged in a systematic effort to understaff its hospitals and clinics and to file false claims with federally funded health insurance programs that do not reflect the actual services performed by its attending physicians.

## A.     Vanderbilt's False Claims for Services of Surgeons

65.     Over the course of Relators' work at Vanderbilt, as a routine practice, Vanderbilt submitted false claims for the services of teaching physician surgeons in operating rooms at the unreduced physician fee schedule rate despite the fact that Vanderbilt knew that it was not entitled to payment for those services under Medicare rules.

66.     At all relevant times, Vanderbilt has known that Medicare only pays an unreduced

18

physician fee schedule rate for operating room procedures only if the attending physician surgeon is present during the key portions of the service or procedure for which the claimant seeks payment, and in the case of surgical procedures, only if the physician is present during all critical portions of the procedure and is immediately available to furnish services during the entire service or procedure.

67. Vanderbilt recognizes that its surgical practices represent both "the largest source of revenue in the Vanderbilt hospital system," as well as its "largest cost center." As a result, Vanderbilt structures attending physician surgeon schedules to reduce the cost of staffing its surgical practices by scheduling a single surgeon for two operations in two operating rooms on two separate patients at the same time. In this way, attending physician surgeons often have more than one patient anesthetized and undergoing an operation simultaneously.

68. Given Vanderbilt's scheduling practices, it is not physically possible for attending physician surgeons to be physically present for all critical portions of their procedures and to be immediately available to furnish services during the entire procedure. Further, attending physician surgeons are often absent from the operating room suite whenever they conduct rounds, take breaks, or visit their offices. As a consequence of these scheduling practices, Vanderbilt's claims for the unreduced physician fee schedule rate do not reflect the actual services performed by Vanderbilt's attending physician surgeons.

69. Relators have personally experienced the consequences of Vanderbilt's scheduling practices. For example, Relators have frequently witnessed operations in which the attending physician surgeon was physically absent, including in the following specialties: Urology, Orthopedics, Thoracic Surgery, General Surgery, Trauma, ENT/Otolaryngology, and Neurosurgery. The routine practice of many surgeons is to schedule multiple simultaneous surgeries in multiple

19

locations throughout the day (at least 50% of the time for certain surgeons), which makes it impossible for those surgeons to perform the critical portions of such simultaneously scheduled procedures or to be immediately available during all portions of those procedures, as required for reimbursement under Medicare Part B.

70.    Vanderbilt's operating room schedules make clear that Vanderbilt surgeons are often required to perform multiple surgeries simultaneously. For example, Dr. D'Alessio observed that Vanderbilt's Neurosurgery OR schedule for July 2006 shows at least the following instances of surgeons covering multiple surgeries at once:

| Date | Surgeon | Schedule |
|------|---------|----------|
| Monday, July 3, 2006 | Dr. Konrad | 7:30am, OR 15, Stg III/IPG Imp, 2.5 hours<br><br>7:30am, OR 16, Occipital Nerve Rhizotomy, 2.5 hours<br><br>9:00am, VUH 6N, IT Baclofen Trial 75 mcg<br><br>10:30am, OR 16, Stg III/IPG Imp, 2.5 hours<br><br>10:30 am, OR 17, Odontoid fracture, Odontoid fixation |
| Wednesday, July 5, 2006 | Dr. Aronson | 7:30am, OR 16, Disectomy-Lumbar Laminectomy, Posterior Lumbar Intervertabral Fusion, 6 hours<br><br>7:30am, OR 17, DLL L2, L3, L4, L5 (Disectomy), 4 hours |
| Thursday, July 6, 2006 | Dr. Cheng | 9:00am, OR 15, Redo L3-S1 Laminectomy & Fusion, Scoli Reduction, 6 hours<br><br>9:00am, OR 17, C5-C7 ACDF, 4 hours<br><br>1:30pm, OR 17, Left C4-C6 Open |

20

| | | Door Laminoplasty, 4 hours |
|---|---|---|
| Friday, July 7, 2006 | Dr. Cheng | 8:30am, OR 14, T10-T11 Reduction Osteotomies, Reduction of Kyphosis, T8-L1, Posterior Fusion, 6 hours<br><br>10:30am, OR 17, Left C67 Microforaminotomy & Disectomy (Metrix), 4 hours |
| Monday, July 10, 2006 | Dr. Konrad | 7:00am, RAD, Bilat Bone Markers w/ CT & MRI<br><br>7:30am, OR 14, Lt Crani for Grids 64x1 20x1<br><br>7:30am, OR 16, Image guided MRI Crani for Sel A-H Left w/ removal of incidental lesion in Left Temporal Meninges, 4 hours |
| Tuesday, July 11, 2006 | Dr. Konrad | 7:00am, RAD, Bilat Bone Markers w/ CT & MRI<br><br>7:30am, OR14, Implantation IT Pump 20 vs 40 cc, 2 hours<br><br>8:30am, VUH, ITB Trial Baclofen |
| Wednesday, July 12, 2006 | Dr. Aronson | 7:30am, OR 16, C5/6 ACDF, 3.5 hours<br><br>7:30am, OR 17, L2, 3, 4, 5 DLL (Disectomy), 6 hours |
| Monday, July 17, 2006 at | Dr. Mericle | 7:30am, OR 14, Right Suboccipital Craniotomy for Janetta Procedure, 5 hours<br><br>7:30am, OR 15, Pterional Crani for (Left) Aneurysm & Intra Operative Angiography, 9 hours |
| Tuesday, July 18, 2006 | Dr. Konrad | 10:00am, OR14, Bilat Sterotactic Placement of DBS Electrodes Gpi, 5.5 hours<br><br>2:00pm, OR17, Revision of Sublaminal Cervical Lead or Ext Lead |

21

| | | 4:00pm, OR14, Wound Revision of Bilateral Cranial Lead Sites, 1.5 hours |
|---|---|---|
| Wednesday, July19, 2006 at | Dr. Aronson | 7:30am, OR 16, Hemilaminectomy Disectomy at L4/5, 4 hours<br><br>7:30am, OR 17, Right Carpal Runnel Release, 1 hour |
| Monday, July 24, 2006 | Dr. Konrad | 7:00am, RAD, Bilat Bone Markers w/ CT & MRI, 2 hours<br><br>7:30am, OR16, Rt RMC for MVD of CN V, 4 hours<br><br>9:00am, VUH, ITB Trial |
| Monday, July 24, 2006 | Dr. Mericle | 10:00am, OR14, Embolization of CC fistula<br><br>12:00pm, OR15, Angigram and Left Carotid Artery Endarterectomy, 5 hours<br><br>2:30pm, OR14, Cerebral Angiogram and Embolization of Intracranial AVM, 4 hours |
| Wednesday, July 26, 2006 | Dr. Konrad | 7:30am, OR14, Lt STN Stereotactic Lesion, 5.5 hours<br><br>7:30am, OR17, Right Removal of Grids & Probable Right Frontal Resection of Epileptogenic Focus, 4 hours<br><br>1:30pm, OR14, DCS Imp – PICES/Octed & Restore, 2.5 hours<br><br>2:00pm, OR 17, Replacement of IPG (Restore-Recharge), 2 hours |

71.    Dr. D'Alessio further witnessed attending orthopedic surgeons who were routinely assigned to two or three operating rooms simultaneously when in fact they were not immediately available for the procedures taking place in each operating room.

22

72.     Across numerous specialties, Dr. D'Alessio observed that physician surgeons commonly were not "immediately available" during surgeries for which Vanderbilt would bill at the unreduced physician rate, including:

| Surgery Department | Physicians |
|---|---|
| General Surgery | 1.  Alan Herline, MD<br><br>2.  Michael Holzman, MD<br><br>3.  Kimberly Lomis, MD<br><br>4.  Kenneth Sharp, MD |
| Neurosurgery | 1.  Peter Konrad, MD<br><br>2.  Joseph Neimat, MD<br><br>3.  Reid Thompson, MD |
| Orthopedics | 1.  John Kuhn, MD<br><br>2.  Donald Lee, MD<br><br>3.  Philip Kregor, MD<br><br>4.  William Obremskey, MD<br><br>5.  Kurt Spindler, MD<br><br>6.  Jeffrey Watson, MD<br><br>7.  Douglas Weikert, MD |
| Otolaryngology | 1.  Brian Burkey, MD<br><br>2.  James Duncavage, MD<br><br>3.  James Netterville, MD<br><br>4.  Robert Sinard |
| Thoracic Surgery | 1.  Robert Roberts, MD |

23

| Trauma | 1. Jose Diaz, MD |
| | 2. Jeffrey Guy, MD |
| Urology | 1. Sam Chang, MD |
| | 2. Michael Cookson, MD |
| | 3. Roger Dmochowski, MD |
| | 4. Duke Herrell, MD |
| | 5. Jay Smith, MD |
| | 6. Joseph Smith, MD |

73. On multiple occasions, Drs. Fisher and Hagerman witnessed trauma orthopedic surgeon Dr. Philip Kregor undertake as many as three simultaneous operations with the vast majority of work being done by unsupervised residents and fellows. They further observed that on many occasions Dr. Kregor's overbooking caused extensive delays of over an hour while residents waited for Dr. Kregor to arrive and verify that their work was adequate. On these occasions patients remained anesthetized for extended periods for no other reason than because the surgeon was not immediately available.

74. In nearly all such instances of overbooking, as Vanderbilt is aware, substantial and critical portions of the procedures were performed by unsupervised residents. Nevertheless, Vanderbilt continues to bill the procedures at the unreduced physician fee schedule rate.

75. In order to disguise the fact that unsupervised residents are performing these procedures, Vanderbilt's electronic record keeping system lists back-up surgeons who are purportedly available to "cover" the procedures of attending surgeons during times when those surgeon have more than one ongoing operation. However, the covering surgeons are not actually

24

responsible for those surgeries. Indeed, they are never in the operating suite and are frequently not even in the hospital during their scheduled coverage.

**B.    Vanderbilt's False Claims for Services of Teaching Physicians in ICUs**

76.    Over the course of Relators' work at Vanderbilt, as a routine practice, Vanderbilt submitted false claims for the services of teaching physicians and intensivists in ICUs at the unreduced physician fee schedule rate despite the fact that Vanderbilt knew that it was not entitled to payment for those services under Medicare rules.

77.    At all relevant times, Vanderbilt has known that Medicare will only pay the unreduced physician fee schedule rate for ICU procedures if the attending physician is present during the key portion of the service or procedure for which Vanderbilt seeks payment. Further, in the case of anesthesia services, Medicare will only pay the unreduced physician fee schedule rate if the attending physician is involved in a single anesthesia procedure involving an anesthesia resident, and only if the physician is present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure.

78.    Nevertheless, Vanderbilt manages its ICUs in such a way that it is impossible for attending physicians and intensivists to be present for many of the procedures billed by Vanderbilt at the unreduced physician fee schedule rate. For anesthesia services, Vanderbilt assigns only one attending physician to cover each ICU during a week-long period, meaning that when he or she is at home, taking a break, or performing procedures in other parts of the hospital, there are no attending anesthesia physicians present in that ICU. In such instances, Medicare does not permit the attending physician to bill at the unreduced physician fee schedule rate.

79.    However, despite the fact that at certain times, including at least 70% of the time on nights and weekends, attending physicians and intensivists are not present in the ICUs, Vanderbilt

continues to bill federal and state health insurance providers at the unreduced physician fee schedule rate for all ICU procedures.

80.     Relator Dr. D'Alessio personally observed and experienced Vanderbilt's failure to adequately staff its ICU facilities throughout the course of his work at Vanderbilt. Indeed, on nights and weekends, Dr. D'Alessio witnessed the complete absence of attending physicians in Vanderbilt's ICU facilities. Dr. D'Alessio and others raised concerns about Vanderbilt's scheduling and staffing policies with Vanderbilt's management on numerous occasions, including with the (now former) head of the Anesthesia Department Dr. Michael Higgins.

81.     For example, as early as October 23, 2003, Dr. D'Alessio sent an email to Dr. John Barwise, acting chief of the Neuro ICU, in order to raise concerns about the quality of care being provided to patients in the Medical ICU ("MICU"), including the following incident report characterizing Vanderbilt's patient care as the "Darwin test" (*i.e.*, only the fittest patients will prevail):

> 10/24-10/25 we were called to the MICU to intubate a patient in 'failure or sepsis' they weren't sure. There were several medical residents who appeared completely befuddled regarding the status of the patient. There was virtually no workup on which they were basing their medical management decisions. I asked where the attending was an (sic) they told me he was at home. The patient had not been seen by an attending and wasn't going to be for at least several more hours because it was nighttime. I won't go into all of the details, however, *this was some of the shoddiest care I have ever seen, particularly in a university hospital. The patient was getting the 'Darwin test' because they didn't want to get an attending physician from home.* I'll call you Monday to give you further details. I think this must be followed up on.

(emphasis added)

82.     Between 2003 and 2007, Relator Dr. Heather Hagerman personally observed and experienced Vanderbilt's failure to adequately staff its ICU facilities during her rotation as a resident across the CVICU, Surgery ICU, and Neuro ICU. For example, for weekend and night-time procedures, attending physicians were rarely present for their procedures (physicians were

26

present no more than 30% of the time). In those circumstances, a Critical Care Fellow would supervise the procedure if one were available. However, because Critical Care Fellows were often unavailable (one fellow covered up to four surgical ICUs and up to 70 beds per night), residents were regularly required to perform the procedures entirely unsupervised.

83.     Dr. Hagerman also observed Vanderbilt's systematic efforts to force its employees to generate fraudulent records to substantiate its false billings to federal and state insurance programs. For this purpose, Vanderbilt created proprietary electronic record keeping systems designed to generate records documenting that attending physicians were present in the ICUs for procedures even when they were not actually present.

84.     In order to satisfy Medicare's billing documentation requirements, Vanderbilt's electronic record keeping systems require that for every ICU procedure residents use an attestation with boilerplate language stating that the attending physician who was covering the ICU during that week was present for all critical portions of the procedure. Vanderbilt made it known to attending physicians and residents that even if an attending physician is not actually involved in or present for a procedure, residents are required to send a false attestation to the attending physician for his or her signature. The effect of this practice is that Vanderbilt has created false records which it can use to support its false claims to federal and state health insurance programs for payment for services performed by attending physicians who were not actually present for the claimed procedures.

85.     Vanderbilt reinforced these practices by making it clear to residents that they were required in all instances to complete their notes, including by filling in the name of the attending physicians for attestation. Further, Vanderbilt placed considerable pressure on the attending physicians to make sure that residents sent those notes to the attending physician for countersignature. For example, by email dated May 13, 2005, Sarah Lovett, Assistant Direct,

27

Coding and Charge Entry, admonished Relator Dr. D'Alessio that he needed to hold his residents accountable for not sending him notes, including by stating as follows:

> If your resident is not properly sending you notes for countersignature, you need to hold them accountable. It is still your responsibility as the attending to make sure your notes are complete, signed, and *billable*.

(emphasis added).

86.     In other instances, when attending physicians submitted notes stating that they were not present for a procedure, Vanderbilt's billing department would automatically pressure the attending physicians to amend their notes, including by sending emails to the attending physician (nearly 100% of the time) to inquire whether he or she was present for the procedure, and instructing the physician, if so, to "make an addendum to your note." In one such instance, Kay Erskin, Coding Specialist, emailed Dr. D'Alessio on April 13, 2005 to explain, "we would miss billing a lot of [procedures] if we didn't ask. I've been instructed to ask."

87.     Senior residents and fellows institutionalize this practice by teaching it to all new residents. Attending physicians further reinforce the practice by instructing all residents at the beginning of each week to send all of their post-procedure records to the attending physicians.

88.     Relator Dr. Fisher also personally experienced and observed Vanderbilt's failure to adequately staff its ICU facilities. Dr. Fisher observed that, as a general rule, attending physicians are absent from Vanderbilt's ICUs on nights and weekends because Vanderbilt did not arrange physician schedules that provide a meaningful opportunity for their continuous 24-hour involvement. Instead, as a routine practice, procedures are performed by unsupervised residents outside of the presence of attending physicians (at least 70% of the time).

89.     Nevertheless, it was Dr. Fisher's experience that residents were expected to prepare post-procedure records using boilerplate language provided by Vanderbilt's electronic record-

keeping programs that attested to the presence of an attending physician who was not actually present at the procedure. The residents would then send their post-procedure records to the attending physician, including in many instances Dr. Fisher. When Dr. Fisher refused to sign off on the residents' records because he was not in fact present at the procedures, Dr. Fisher would receive emails from Vanderbilt's billing staff pressuring him to sign off on the records.

90. Vanderbilt pointedly referred to records without signed attestations as "missed billing opportunities." For example, on or about May 16, 2006, Relator Dr. D'Alessio received an email from Carrie Nalls of Vanderbilt's Billing Department with the subject line, "documentation/missed billing opportunity." In response, Dr. D'Alessio raised concerns about the billing department placing pressure on attending physicians to sign-off on being present at procedures when they were not in fact present, including by stating as follows:

> Receiving sign-out from the resident who has rounded on the patient does not meet the criteria required by payers for attending supervision. I tell the residents not to send me notes for patients I have not seen that day. Therefore, if I have not signed off on a note . . . I was not present and will not take responsibility for signing it for that day. . . . Please forward this to all of your colleagues in the billing office so that I stop getting emails about these notes.

91. In order to further conceal its fraudulent billing practices, Vanderbilt encouraged ICU nurses to prepare purposefully misleading post-procedure notes. For example, Vanderbilt management and staff directed ICU nurses to leave out of their notes any indication of which doctor performed the critical care services, or who was actually present during procedures.

92. Despite being aware that attending physicians are often absent from its ICUs, Vanderbilt continues to submit false claims under Medicare Part B for teaching physicians at the unreduced physician fee schedule rate. Indeed, Vanderbilt has placed its physicians and nurses in the impossible situation of requiring them to help Vanderbilt hide its true scheduling and staffing

29

practices by creating false records of its procedures in support of false billings reflecting higher levels of service than are actually performed.

## C. Vanderbilt's False Claims for Medically Directed Anesthesia Services

93. Over the course of Relators' work at Vanderbilt, as a routine practice, Vanderbilt submitted false claims for medically directed anesthesia services despite the fact that it knew that Vanderbilt was not entitled to payment for those services under Medicare rules.

94. Vanderbilt's scheduling and staffing practices often require its anesthesiologists to cover cases in separate operating suites located on separate floors or in separate buildings.

95. Vanderbilt also routinely assigns anesthesiologists to supervise one or more operating rooms at the same time they are assigned to conduct rounds and perform separately billable procedures on pain patients located outside of the operating suite. Indeed, at least 70% of the time, the anesthesiologist assigned to cover the Anesthesia Pain Service ("APS") is simultaneously assigned to supervise one or more operating rooms.

96. Vanderbilt further routinely assigns anesthesiologists to cover one or more operating rooms at times when those anesthesiologists are actually conducting administrative meetings and fulfilling teaching responsibilities in locations distant from those operating rooms. In fact, Vanderbilt's departmental leaders, including Drs. Michael Higgins and James Berry, routinely schedule such meetings during their scheduled patient operations.

97. As a result of being spread across so many locations and responsibilities, it is virtually impossible for Vanderbilt's anesthesiologists to perform many of the services required to qualify for the "medically directed" billing rate. Indeed, Vanderbilt's anesthesia services do not meet at least one of the criteria for billing anesthesia services as "medically directed" nearly 100% of the time.

30

98.     Nevertheless, Dr. D'Alessio learned from a member of Vanderbilt's medical administration, Frank Rosato, that Vanderbilt bills *all* anesthesia services performed in operating rooms as "medically directed." Dr. D'Alessio subsequently confirmed Vanderbilt's false billing practices when Dr. Higgins appointed him to the Compensation Committee, which provided Dr. D'Alessio with access to Vanderbilt's billing and collections records. Thus, Dr. D'Alessio learned that Vanderbilt has been falsely billing federal and state health insurance programs for medically directed anesthesia services despite the fact that in many, if not all, instances those services do not meet the criteria for medical direction.

99.     During the course of Relators' work for Vanderbilt, they personally observed that anesthesiologists failed to perform at least one of the seven medical direction criteria in almost all cases, including at least the requirements for the physician to perform a pre-anesthetic examination and evaluation, personally participate in the most demanding aspects of the anesthesia plan, monitor the anesthesia at frequent intervals, remain physically present and available for immediate diagnosis and treatment of emergencies, and provide indicated post-anesthesia care.

### i.   Failure to Perform Pre-Anesthetic Examination and Evaluation

100.    The Relators have personally observed that, as a routine practice, Vanderbilt's physicians do not perform pre-anesthetic examinations and evaluations of their patients. Instead, these examinations and evaluations are performed almost 100% of the time by nurse practitioners. In fact, SRNAs who were in no way involved in the care of the patient except to document a pre-operative assessment perform the vast majority of such pre-operative assessments.

101.    This routine practice of passing off pre-anesthetic examination responsibilities from physicians to nurse practitioners and SRNAs is known and encouraged by Vanderbilt's leadership despite the fact that it creates dangerous risks for patients. For example, by email dated December

31

9, 2005, Dr. Michael Pilla raised this issue with the Department of Anesthesia, including by copying the Chairman of the Anesthesia Department, Dr. Michael Higgins, and asked, "Why are in house preops being assigned to SRNAs who are not doing the cases the next day?"

      ii.    **Failure to Participate in the Most Demanding Aspects of the Anesthesia Plan, Monitor the Anesthesia Plan at Frequent Intervals, or to be Physically Present and Available for Immediate Diagnosis and Treatment**

102.    The Relators have further observed that, as a routine practice, Vanderbilt's physicians do not personally participate in the most demanding aspects of the anesthesia plan, monitor the anesthesia at frequent intervals, or remain physically present and available for immediate diagnosis and treatment of emergencies. Vanderbilt manages its physicians and staff in such a way that attending physicians are often completely absent from the administration of anesthesia (at least 90% of the time).

103.    Vanderbilt has dispersed the locations at which anesthesia services are administered across a vast geographic range of VUMC. However, Vanderbilt routinely tasks attending anesthesiologists with responsibility for procedures being administered simultaneously at two or more locations, including concurrent assignments at the following sites:

    a.    The Main Operating Rooms ("MOR"): Eighteen operating rooms located on the third floor of the University Hospital Building.

    b.    Vanderbilt Clinic ("TVC"): Building with four operating rooms located 50 yard away from the MOR.

    c.    Medical Center East ("MCE"): Building with ten operating rooms located across the street from the MOR.

    d.    Gastrointestinal Labs: First floor of the University Hospital Building and/or TVC.

32

e. Radiology Suite: Multiple sites including the first floor of the University Hospital Building.

f. Plastic Surgery Clinic: Located on the sixth floor of the MCE.



104. In addition to these geographic limitations, it is impossible for Vanderbilt's physicians to personally participate in the most demanding aspects of the anesthesia plan, monitor the anesthesia at frequent intervals, or remain physically present and available for immediate diagnosis and treatment of emergencies because Vanderbilt overloads its anesthesiologists with competing responsibilities for concurrent procedures that it bills as medically directed.

105. Attending physicians are routinely assigned to medically direct anesthesia in operating rooms while they are simultaneously staffed to conduct rounds or perform separately billable procedures on pain patients in the APS or in one of the Intensive Care Units, including for

33

example as described in the following emails:

    a. In an email dated April 7, 2004, Kim Suttle, Secretary for the Anesthesia Department informed Vanderbilt's anesthesiologists that Vanderbilt would be running two additional operating rooms in the MCE building, and as a result, "the APS faculty may (also) be asked to cover a room in the MOR," which is located in the University Hospital Building across the street from the MCE building.

    b. In an email dated February 13, 2006, Dr. D'Alessio's supervisor, Dr. James Berry, informed Dr. D'Alessio that "I appreciate your working on the APS this week. However, we still need the APS attending to cover an OR at times. I realize this affects the ability to round in remote locations . . . but this is part of the obligation."

106.    It is common for an attending physician to be assigned cases on the first floor of the University Hospital Building and simultaneously assigned to cases in the MOR (on the third floor of the University Hospital Building), the MCE (across the street from the University Hospital Building), and/or TVC (50 yards away from the University Hospital Building). In addition, in the afternoon it is common for attending physicians to be assigned more cases at the MOR, the MCE, and/or TVC.

107.    In reality, an attending physician cannot be present at all of those locations. As a matter of course, attending physicians never have a significant presence within the pre-operative clinic, or any role in examining or interviewing patients in the pre-operative clinic. As a result, anesthesiologists who are assigned to cover the pre-operative clinic must make medical decisions about pre-operative patient work-ups without having seen or examined the patient or having personally reviewed the patient's chart.

34

108.    Similarly, because of their conflicting schedules, attending physicians are simply unable to be present or readily available for many of the anesthetics that Vanderbilt bills at the medically directed rate, which take place in multiple buildings or on multiple floors at the same time. As a consequence, for many anesthetics, residents, nurse anesthetists, and student nurse anesthetists are tasked with administering anesthesia services without the direction of an attending physician.

109.    For example, in both TVC and MCE, anesthesiologists are assigned to supervise four operating rooms simultaneously. These four rooms were expected to start at 7:30am without staggered start times. Because of this, attending physicians often were not involved in the critical portions of the anesthesia service, including notably the induction. In TVC, Vanderbilt institutionalized this absence from induction by having a senior resident serve as a "TVC fellow" to take the place of the assigned attending physician. Nevertheless, Vanderbilt documented all billing as if the attending physicians were actually present.

110.    In other instances, attending physicians simply choose not to be physically present or immediately available to give medical direction. For example, the former Chairman of the Anesthesia Department Dr. Michael Higgins would frequently preside over meetings during times when he was assigned to medically direct anesthesia procedures in different locations in the hospital.

111.    Dr. Fisher has personally observed how these patient care issues have caused serious risks to Vanderbilt's patients. For example, in or about mid-December 2007, Dr. Fisher observed and reported to Vanderbilt's leadership an incident involving an anesthesia procedure being performed by an unsupervised SRNA in the MOR, and as described in paragraphs 135 through 138 below, Dr. Fisher's decision to report this incident eventually resulted in his dismissal

35

from Vanderbilt.

112.    On the day of the incident, Dr. Fisher was not assigned to the MOR; however, an anesthesia tech urgently summoned Dr. Fisher into the MOR to assist with a procedure that had developed into an emergency. When Dr. Fisher reached the operating room, he found an unsupervised SRNA treating a sedated patient who was undergoing a complicated brain operation which required the patient to be awake but calm while a physician implanted an electrode deep into the patient's exposed brain. The attending physician Dr. Stewart Perlman was nowhere to be found, and the patient appeared to be cyanotic and increasingly bradycardic (*i.e.*, what happens right before a patient goes into cardiac arrest from hypoxia) as a result of inappropriate airway management. With the assistance of other physicians and nurses, Dr. Fisher stabilized the patient; however, he was deeply concerned when he learned that at the time of the incident the attending physician, Dr. Perlman, was apparently at or near his office in TVC (in an entirely different building).

### iii.    Failure to Provide Post-anesthesia Care

113.    The Relators have further observed that, as a routine practice, Vanderbilt's physicians do not provide indicated post-anesthesia care. Indeed, as a general rule, physicians at Vanderbilt seldom even enter the Post Acute Care Unit and simply do not evaluate patients in the recovery room following anesthesia. Up until 2003, Vanderbilt had tasked a single anesthesiologist with responsibility for performing all of the rounding on post-operative patients; however, since 2003, when that physician left Vanderbilt, post-operative assessment is left entirely to nurses.

114.    Since as early as 2003, Vanderbilt has been fully aware of these post-operative evaluation issues. For example, by email dated December 9, 2005, Dr. Michael Pilla raised the issue with the Department of Anesthesia, including by copying the Chairman of the Anesthesia Department Dr. Michael Higgins, and stated as follows: "Why are there no post ops being done?

36

This is *ethically wrong, and moreso, illegal . . . .*" (emphasis added)

### iv. Failure to Follow 2:1 Ratio when Directing an SRNA

115. Vanderbilt has also violated the conditions for claiming medical direction for procedures performed by SRNAs. Particularly during breaks, lunches and after 3pm when many CRNAs are off duty, Vanderbilt routinely assigns SRNAs to relieve residents and CRNAs for breaks of 15 to 30 plus minutes (at least 90% of breaks).

116. As a consequence, during these times, attending physicians that are billing for medically directed anesthesia services may only concurrently direct two cases (reduced from four). However, Vanderbilt does not adjust the case load of its attending physicians during these time periods, and it continues to bill all such anesthesia services as medically directed.

### v. Failure to Respond to Medically Directed Billing Issues

117. Vanderbilt knows that it routinely bills federal and state health insurance programs for "medically directed" anesthesia services that do not meet the requirements for such payments. Several physicians have raised this issue to the attention of Vanderbilt management, including specifically to the former Chairman of the Anesthesia Department Dr. Michael Higgins.

118. For example, during an Anesthesia Department Board meeting in 2004, Vice Chairman Dr. Michael Pilla raised concerns to Vanderbilt's management about Vanderbilt's compliance with Medicare's criteria for medical direction, including specifically the requirement that an attending physician may not cover more than two locations whenever an SRNA is the sole provider for one or more of those cases. The acting Chairman Dr. Higgins responded to Dr. Pilla's concerns by telling him "it was none of his business."

119. Subsequently, in at least one email, Vanderbilt's management has stated that it will act in compliance with Medicare staffing regulations; however, Vanderbilt has not changed its

staffing practices to address this issue. Vanderbilt continues to assign SRNAs to operating rooms during times when CRNAs are on breaks and at nights and on weekends, without modifying or adjusting the number of operating rooms that the attending physicians are assigned to cover.

120.    Relator Dr. D'Alessio repeatedly voiced his concerns that attending physicians were routinely absent from operating room procedures, especially during nights and weekends, including by email to his supervisor Dr. James Berry dated February 28, 2005, stating in relevant part:

> The ORs are busy on nights and weekends. How can we be expected to cover these additional locations when we have 3 rooms going? There are billing issues to be considered. I'll not state that I am immediately available if I'm not on the floor and am upstairs in the ICU/TICU performing a procedure. I don't think it is reasonable to ask faculty to do this. We can't have it both ways.

121.    Even after Dr. D'Alessio raised these concerns, Vanderbilt attending physicians, including Drs. Higgins and Berry, often billed anesthetics as medically directed, even if they were not in the operating room, on the same floor, or even in the same building while the procedures were taking place. Indeed, because of conflicting schedules and otherwise, it has been the Relators' personal experience that for many procedures Vanderbilt attending physicians are on a different floor or outside of the building during operating room anesthesia procedures that are being billed at the medically directed rate.

122.    Further, despite having knowledge of the failure of medical direction (as raised by Drs. Pilla and D'Alessio), Vanderbilt has made no effort to notify government authorities or to make corrections to previously submitted false bills. Approximately three to four years after the warnings of Drs. D'Alessio and Pilla, in or about 2008, Vanderbilt conducted an internal audit of its billing and Medicare compliance practices, which resulted in a finding, *inter alia*, that Vanderbilt's claims for anesthesia services were not supported by adequate documentation of the conditions for medical direction, including notably the absence of documentation that physicians were performing

38

pre-operative examinations and post-anesthesia care.

123.    Given the results of the audit, Vanderbilt had an obligation to disclose these discrepancies to the government and to repay any overpayments received.    Indeed, Vanderbilt's failure to disclose known billing errors is punishable as a felony offense, pursuant to 42 U.S.C. § 1320a-7b(a)(3), which provides:

> Whoever . . . having knowledge of the occurrence of any event affecting his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a concealment or failure . . . be guilty of a felony.

124.    After its audit, Vanderbilt ignored its responsibilities and it did not make the required disclosures to the Government, did not repay the Government for its false claims for medically directed anesthesia services, and did not make any changes to its scheduling or staffing practices to ensure that going forward attending physicians would perform the necessary conditions for medical direction, including post-anesthesia care.

125.    Rather, as a consequence of its audit, Vanderbilt has perfected the way in which it conceals its ongoing false billings.  It simply amended its billing software such that physicians completing the post-procedure records have no choice but to certify that they have provided post-anesthesia care.  Further, despite its audit findings, Vanderbilt continues to submit false and fraudulent claims to federal and state health insurance programs for medically directed anesthesia services.

**D.    Vanderbilt's Use of Electronic Medical Record Systems to Maximize its False Billing Practices**

126.    Beginning as early as 1995, Vanderbilt's Anesthesia Department, including specifically Drs. Michael Higgins and Jeffrey Balser, "collaborated in the engineering, design and

39

development of a . . . comprehensive electronic patient information system specialized for high-acuity care." Among the stated objectives of the system was for Vanderbilt to "[i]mprove financial margins with greater staff and resource efficiency."

127. By 2002, Vanderbilt had created a comprehensive perioperative system for the use of nurses, surgeons, and anesthesiologists throughout the entire patient care process from the initial preoperative visit in the surgical clinic through all phases of operative care, and it deployed this system across all of Vanderbilt's operating room suites under the name Vanderbilt Perioperative Information Management System ("VPIMS").

128. The VPIMS has been lauded for providing Vanderbilt with numerous benefits, including capturing key clinical and billing data, proactively monitoring key performance metrics, and optimizing reimbursement. Vanderbilt touts that its "Department of Anesthesiology has experienced a 67% reduction in the average time to complete and submit an anesthesia chart to billing and a 69% decrease in the number of anesthesia charts that need correction or resubmission."

129. However, in reality, Vanderbilt has used the VPIMS to maximize its false billing practices by taking advantage of its remote access features to schedule attending physicians to be in multiple places at once, while continuing to bill their services as if they were actually present and personally performing the services at each place. VPIMS' purported improvements in billing efficiency are in fact largely a function of Vanderbilt's development of mandatory default software settings that require its physicians, in all instances, to document that they meet Medicare's conditions for payment.

130. For example, for all anesthesia procedures, VPIMS provides a default setting for physicians to bill the procedures as "medically directed" under the QK modifier. Even if the criteria for "medically directed" are not met, the physician completing the form has no choice but to select

40

it. There is no option for "medical supervision" under the AD modifier despite the fact that given Vanderbilt's scheduling practices, "medical supervision" is almost always the correct billing option.

131. Vanderbilt also created an electronic system called GasChart for providing anesthesiologists with an electronic program to record, *inter alia*, vital signs, medications, the timing of the procedure, and attending anesthesiologists. As a default requirement of GasChart, the attending anesthesiologist is required to attest to the accuracy of the record, including his or her participation in the necessary steps for medical direction. After signing off on the record, GasChart automatically sends the record to the billing department and sends the final anesthesia record to the hospital record system.

132. Thus, by creating these electronic steps, Vanderbilt has set up a system whereby physicians simply have no choice but to record and document the facts that support Vanderbilt's submission of false billings to Medicare. Indeed, because the creation of patient medical records is a vital component of patient care and Vanderbilt provides only one means of creating such records, Vanderbilt's physicians are forced to follow Vanderbilt's electronic record keeping steps in order to provide their patients with an appropriate standard of care.

133. Since Vanderbilt utilizes computer software it knows will generate false billings, it also seeks to minimize the creation of any documentation that will conflict with the computer generated documentation. In fact, Vanderbilt discourages attending physicians from making handwritten notes that might truthfully indicate, for example, that more than four anesthesia procedures are being covered by one physician in violation of the conditions for "medical direction."

134. As another example, on November 11, 2004, administrative personnel within the anesthesia department sent an email to Vanderbilt's anesthesiologists admonishing them not to

41

make notations in the record:

> Our billing department has software which automatically detects the
> number of rooms we are covering at each moment during the day. Billing
> is automatic and appropriate for the "concurrency of each moment."

> Please do not make any notations in the record about how many rooms
> you are currently covering;

> It only confuses and complicates the billing and documentation process.

135. Thus, by limiting the use of handwritten notes, Vanderbilt effectively prevents its attending physicians from correcting errors in the record, further compromising Vanderbilt's ability to comply with Medicare rules that require, for example, anesthesiologists to document the beginning and ending times of procedures to make clear the "concurrency" of ongoing and simultaneous procedures.

### E. Vanderbilt's Retaliation against Employees who Questioned Vanderbilt's Practices

136. When physicians have raised questions about Vanderbilt's billing practices with Vanderbilt management or raised patient care issues relating to Vanderbilt's understaffing, those physicians have been dismissed or their contracts have not been renewed.

137. In December 2007, after the incident described in paragraphs 109 through 110, in which Dr. Fisher helped an unsupervised SRNA to stabilize a distressed patient, Dr. Fisher publicly voiced his concerns about how Vanderbilt's system for scheduling attending physicians led to that incident. That same day, Dr. Fisher reported his concerns about the incident to Dr. Michael Higgins by email, stating that he would be willing to file a formal complaint about the absence of attending physician Dr. Stewart Perlman, including, if necessary, by going outside of the department.

138. Two days later, Dr. Fisher met with the Chairman of Vanderbilt and the Chairman informed Dr. Fisher that he would need to look for another job. Dr. Fisher was also denied an

42

opportunity to appeal the Chairman's decision. Both the Dean of Vanderbilt Medical School and the Chief of Staff refused to meet with Dr. Fisher.

139. Dr. Fisher did meet with Dean Raiford, Dean of Faculty Affairs, and he voiced his concerns about the understaffing of attending physicians and Vanderbilt's pattern of terminating the employment of any physician who raises concerns about Vanderbilt's billing or the lack of appropriate supervision for nurses and physician trainees. Dr. Fisher provided Dean Raiford with a list of 17 faculty members, including Relator Dr. D'Alessio, many of whom left the Department of Anesthesiology for reasons relating to Vanderbilt's false billing, safety issues, and/or improper staffing practices.

    a.  John D'Alessio, M.D.

    b.  Tito Carrero, M.D.

    c.  Hani Alalalei, M.D.

    d.  William Goldsmith, M.D.

    e.  Robert Pousman, M.D.

    f.  Andrew Oken, M.D.

    g.  Scott Buntin, M.D.

    h.  Joe Lester, M.D.

    i.  Chad Wagner, M.D. (subsequently returned)

    j.  Hugh Dalton, M.D.

    k.  Clark Scovell, M.D.

    l.  Michael Pilla, M.D. (subsequently returned)

    m.  Gary Walker, M.D.

    n.  Dan Oaks, M.D.

o. John Hairr, M.D.

p. Diana Voicalescu, M.D.

q. John Shields, Assistant Chief CRNA, directly responsible for scheduling the various operating room locations for CRNAs.

140.     Nevertheless, Vanderbilt chose not to renew Dr. Fisher's contract, and within six months of Dr. Fisher reporting the operating room incident to Dr. Higgins, Dr. Fisher was required to leave Vanderbilt. The only plausible reason for Vanderbilt's harsh response to Dr. Fisher's complaint is Vanderbilt's concern that Dr. Fisher would reveal Vanderbilt's systematic abandonment of its patients, doctors, and nurses, and/or its false billing practices.

**COUNT I**
**SCHEME TO SUBMIT FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A))**

141.     All of the preceding allegations are incorporated herein.

142.     Defendants are engaged in a scheme to defraud the United States Government into approving or paying false claims.

143.     Defendants submit fraudulent claims to the United States Government for health care services provided to beneficiaries of federal health care insurance programs, for among other things:

a. Operating room physician services performed by attending physicians when in fact such services were performed by unsupervised medical residents.

b. ICU physician services performed by attending physicians when in fact such services were performed by unsupervised medical residents.

c. Medically directed anesthesia services performed in operating rooms and other medical facilities when in fact such services did not meet the criteria for medical direction.

44

144. All Defendants' claims submitted during the subject time period in support of this fraudulent scheme and continuing through the resolution of this lawsuit are false or fraudulent claims.

145. Defendants present and/or cause to be presented such claims for payment to the United States despite having knowledge of their falsity.

146. The United States Government would not have paid these false or fraudulent claims, had it known that Defendants were improperly submitting false claims for health care services provided to beneficiaries of federal health care insurance programs.

147. These fraudulent submissions are presently being made by Defendants, and absent action by the Court, will continue during the pendency of this action.

## COUNT II
## SUBMISSION OF CLAIMS CONTAINING FALSE EXPRESS OR IMPLIED CERTIFICATIONS (31 U.S.C. § 3729(a)(1)(A))

148. All of the preceding allegations are incorporated herein.

149. Defendants submit false claims for health care services provided to beneficiaries of federal health care insurance programs, for among other things:

    a. Operating room physician services performed by attending physicians when in fact such services were performed by unsupervised medical residents.

    b. ICU physician services performed by attending physicians when in fact such services were performed by unsupervised medical residents.

    c. Medically directed anesthesia services performed in operating rooms and other medical facilities when in fact such services did not meet the criteria for medical direction.

150. Defendants' claims for payment contain an express certification that Defendants'

45

claims conform to federal law  For all such claims, Defendants submit a claim form to the Federal

government, which includes the following certified language:

> This is to certify that the foregoing information is true, accurate and complete.  I understand
> that payment and satisfaction of this claim will be from Federal and State funds and that any
> false claims, statements, or documents, or concealment of a material fact may be prosecuted
> under applicable Federal or State laws.

151.     Defendants expressly certify that their claims conform to federal law despite

Defendants having knowledge that they do not conform to federal law.

152.     Thus, Defendants knowingly (1) have presented or caused to be presented, and (2)

continue to present or cause to be presented, to an officer or employee of the United States

Government, false or fraudulent claims for payment or approval.

153.     In any event, Defendants' submission of claims to the United States Government

constitutes an implied certification that Defendants' claims conform to federal law.

154.     Defendants implicitly certify that their performance conforms to federal law despite

Defendants having knowledge that they do not conform to federal law.

155.     Thus, Defendants knowingly (1) have presented or caused to be presented, and (2)

continue to present or cause to be presented, to an officer or employee of the United States

Government, false or fraudulent claims for payment or approval.

156.     These fraudulent submissions are presently being made by Defendants, and absent

action by the Court, will continue during the pendency of this action.

### COUNT III
### FALSE RECORDS FOR PAYMENT (31 U.S.C. § 3729(a)(1)(B))

157.     All of the preceding allegations are incorporated herein.

158.     Every document that Defendants have provided to the Government that makes

representations about health care services provided to beneficiaries of federal health insurance

46

programs is a false record or statement that is material to Defendants' claims for payment and approval under such programs.

159. Defendants submitted false records or statements to the Government representing that Defendants were entitled to payment and approval for health care services provided to beneficiaries of federal health insurance programs, including, among other things:

a. Operating room physician services performed by attending physicians when in fact such services were performed by unsupervised medical residents.

b. ICU physician services performed by attending physicians when in fact such services were performed by unsupervised medical residents.

c. Medically directed anesthesia services performed in operating rooms and other medical facilities when in fact such services did not meet the criteria for medical direction.

160. All such false records or statements were knowingly made to the Government to get false or fraudulent claims paid or approved by the Government.

161. Defendant thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

## COUNT IV
## FALSE CLAIMS CONSPIRACY (31 U.S.C. § 3729(a)(1)(C))

162. All of the preceding allegations are incorporated herein.

163. Defendants entered into a conspiracy or conspiracies through their member physicians, officers, and employees to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for health care services provided to beneficiaries of federal health insurance programs, for among other things:

a. Operating room physician services performed by attending physicians when in

47

fact such services were performed by unsupervised medical residents.

b. ICU physician services performed by attending physicians when in fact such services were performed by unsupervised medical residents.

c. Medically directed anesthesia services performed in operating rooms and other medical facilities when in fact such services did not meet the criteria for medical direction.

164. Defendants also conspired through their member physicians, officers, and employees to omit disclosing or to actively conceal facts which, if known, would have reduced the federal government's obligations to pay them or would have required them to repay the federal government.

## COUNT V
## FALSE RECORDS TO AVOID REFUND (31 U.S.C. § 3729(a)(1)(G))

165. All of the preceding allegations are incorporated herein.

166. By virtue of the acts alleged herein the Defendants knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay or transmit money to the Government.

## COUNT VI
## RETALIATION (31 U.S.C. § 3730(h))

167. All of the preceding allegations are incorporated herein.

168. By virtue of the acts alleged herein, Defendants threatened, harassed, and/or dismissed, and/or discriminated against, Relator Dr. Fisher in the terms and conditions of his employment after Dr. Fisher lawfully reported what he believed to be fraudulent conduct or wrongdoing to his superiors in violation of 31 U.S.C. § 3730(h).

169. Relator Dr. Fisher seeks compensatory damages and other appropriate statutory

48

relief pursuant to this section.

## COUNT VII
### (California False Claims Act)
### (Cal. Govt. Code §§ 12651 et seq.)

170.    All of the preceding allegations are incorporated herein.

171.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

172.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

173.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

174.    By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

175.    Pursuant to Cal. Govt. Code § 12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT VIII
### (Delaware False Claims and Reporting Act)
### (Del Code Ann. tit. 6, §§ 1201 et seq.)

176.    All of the preceding allegations are incorporated herein.

177.    By virtue of the acts described above, Defendants knowingly presented or caused to

be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

178.  By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

179.  The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

180.  By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

181.  Pursuant to Del Code Ann. tit. 6, § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT IX
## (Florida False Claims Act)
## (Fla. Stat. Ann. §§ 68.081 et seq.)

182.  All of the preceding allegations are incorporated herein.

183.  By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

184.  By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

185.  The Florida State Government, unaware of the falsity of the records, statements and

50

claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

186. By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

187. Pursuant to Fla. Stat. Ann. § 68.082(2), the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT X
### (Georgia False Medicaid Claims Act)
### (Ga. Code. Ann. §§ 49-4-168.1 et seq.)

188. All of the preceding allegations are incorporated herein.

189. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

190. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

191. The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

192. By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

51

193. Pursuant to Ga. Code. Ann. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XI**
**(Hawaii False Claims Act)**
**(Haw. Rev. Stat. §§ 661-21 et seq.)**

194. All of the preceding allegations are incorporated herein.

195. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

196. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

197. The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

198. By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

199. Pursuant to Haw. Rev. Stat. § 661-21(a), the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XII
### (Illinois Whistleblower Reward and Protection Act)
### (740 Ill. Comp. Stat. §§ 175/1 et seq.)

200.    All of the preceding allegations are incorporated herein.

201.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

202.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

203.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

204.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

205.    Pursuant to 740 Ill. Comp. Stat. § 175/3(a), the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XIII
### (Indiana False Claims and Whistleblower Protection Act)
### (Ind. Code §§ 5-11-5.5-1 et seq.)

206.    All of the preceding allegations are incorporated herein.

207.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

53

208. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

209. The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

210. By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

211. Pursuant to Ind. Code § 5-11-5.5-2(b), the State of Indiana is entitled to three times the amount of actual damages plus at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XIV
### (Louisiana Medical Assistance Programs Integrity Law)
### (La. Rev. Stat. Ann. §§ 46:439.1 et seq.)

212. All of the preceding allegations are incorporated herein.

213. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

214. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

215. The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as

54

alleged herein.

216.   By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

217.   Pursuant to La. Rev. Stat. Ann. § 46:438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XV**
**(Massachusetts False Claims Law)**
**(Mass. Gen. Laws ch. 12, §§ 5A et seq.)**

218.   All of the preceding allegations are incorporated herein.

219.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts Commonwealth Government for payment or approval.

220.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts Commonwealth Government to approve and pay such false and fraudulent claims.

221.   The Massachusetts Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

222.   By reason of the Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

223.   Pursuant to Mass. Gen. Laws ch. 12, § 5B, the Commonwealth of Massachusetts is

55

entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XVI**
**(Michigan Medicaid False Claims Act)**
**(Mich. Comp. Laws §§ 400.601 et seq.)**

224.     All of the preceding allegations are incorporated herein.

225.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Michigan for payment or approval.

226.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

227.     The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

228.     By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

229.     Pursuant to Mich. Stat. § 400.612, the State of Michigan is entitled to a civil penalty equal to the full amount received by the person benefiting from the fraud, three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XVII
## (Nevada False Claims Act)
## (Nev. Rev. Stat. §§ 357.010 et seq.)

230.    All of the preceding allegations are incorporated herein.

231.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

232.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

233.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

234.    By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

235.    Pursuant to Nev. Rev. Stat. § 357.040(1), the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XVIII
## (New Hampshire False Claims Act)
## (N.H. Rev. Stat. Ann. § 167:61-b)

236.    All of the preceding allegations are incorporated herein.

237.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or

approval.

238.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

239.    The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

240.    By reason of the Defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

241.    Pursuant to § 167:61-b, the State of New Hampshire is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XIX
### (New Jersey False Claims Act)
### (N.J. Stat. Ann. §§ 2A:32C-1 et seq.)

242.    All of the preceding allegations are incorporated herein.

243.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

244.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

58

245.     The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

246.     By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

247.     Pursuant to N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty allowed under the federal False Claims Act, 31 U.S.C. § 3729, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XX**
**(New Mexico Medicaid False Claims Act and Fraud Against Tax Payers Act)**
**(N.M. Stat. Ann. §§ 27-14-1 et seq. and §§ 44-9-1 et seq.)**

248.     All of the preceding allegations are incorporated herein.

249.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

250.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

251.     The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

59

252.    By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

253.    Pursuant to N.M. Stat. Ann. § 27-14-4 and § 44-9-3, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXI
### (New York False Claims Act)
### (N.Y. State Fin. Law §§ 187 et seq.)

254.    All of the preceding allegations are incorporated herein.

255.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

256.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

257.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

258.    By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

259.    Pursuant to N.Y. State Fin. Law § 189.1(g), the State of New York is entitled to three times the amount of actual damages plus the maximum penalty of $12,000 for each and every

false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XXII**
**(Oklahoma Medicaid False Claims Act)**
**(63 Okla. St. Ann. §§ 5053 et seq.)**

260.     All of the preceding allegations are incorporated herein.

261.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

262.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

263.     The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

264.     By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

265.     Pursuant to 63 Okl. St. Ann. § 5053.1(B), the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

61

## COUNT XXIII
## (The State False Claims Act (Rhode Island))
## (R.I. Gen. Laws §§ 9-1.1-1 et seq.)

266.    All of the preceding allegations are incorporated herein.

267.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

268.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

269.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

270.    By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

271.    Pursuant to R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXIV
## (Tennessee Medicaid False Claims Act)
## (Tenn. Code Ann. §§ 71-5-181 et seq.)

272.    All of the preceding allegations are incorporated herein.

273.    By virtue of the acts described above, Defendants knowingly presented or caused to

62

be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

274.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

275.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

276.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

277.    Pursuant to Tenn. Code § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty of $25,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXV
### (Texas Medicaid Fraud Prevention Law)
### (Tex. Hum. Res. Code Ann. § 36.002)

278.    All of the preceding allegations are incorporated herein.

279.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

280.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

63

281. The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

282. By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

283. Pursuant to Tex. Hum. Res. Code Ann. § 36.052, the State of Texas is entitled to two times the amount of actual damages plus the maximum penalty of $15,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXVI
### (Virginia Fraud Against Taxpayers Act)
### (Va. Code Ann. §§ 8.01-216.1 et seq.)

284. All of the preceding allegations are incorporated herein.

285. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia Commonwealth Government for payment or approval.

286. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia Commonwealth Government to approve and pay such false and fraudulent claims.

287. The Virginia Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

64

288.     By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

289.     Pursuant to Va. Code § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XXVII**
**(Wisconsin False Claims for Medical Assistance Law)**
**(Wisc. Stat. § 20.931)**

290.     All of the preceding allegations are incorporated herein.

291.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

292.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay such false and fraudulent claims.

293.     The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

294.     By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

295.     Pursuant to Wisc. Stat. § 20.931(2), the State of Wisconsin is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or

fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXVIII
### (District of Columbia False Claims Act)
### (D.C. Code Ann. §§ 2-308.03 et seq.)

296.    All of the preceding allegations are incorporated herein.

297.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

298.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

299.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

300.    By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

301.    Pursuant to D.C. Code Ann. § 2-308.14, the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief

66

from each of the Defendants, jointly and severally, as to the federal claims:

A. Three times the amount of damages that the Government sustains because of the acts of Defendants;

B. A civil penalty of $11,000 for each violation;

C. An award to the Qui Tam Plaintiff for collecting the civil penalties and damages;

D. Award of an amount for reasonable expenses necessarily incurred;

E. Award of the Qui Tam Plaintiff's reasonable attorneys' fees and costs;

F. Interest;

G. Such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including: (1) two times the amount of back pay with appropriate interest; (2) compensation for special damages sustained by Relator in an amount to be determined at trial; (3) litigation costs and reasonable attorneys' fees; (4) such punitive damages as may be awarded under applicable law; and (5) reasonable attorneys' fees and litigation costs in connection with Relator's Section H claim;

H. Such further relief as the Court deems just.

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally, as to the State claims:

A. Relators and each named State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each State as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants within each State, all as provided by:

        Cal. Govt. Code § 12651;
        6 Del. C. § 1201;

Fla. Stat. Ann. § 68.082;
Ga. Code Ann. § 49-4-168.1;
Haw. Rev. Stat. § 661-21;
740 Ill. Comp. Stat. § 175/3;
Ind. Code § 5-11-5.5-2 ;
La. Rev. Stat. § 46:438.6;
Mass. Gen. Laws Ch. 12 § 5B;
Mich. Comp. Laws § 400.612;
Nev. Rev. Stat. Ann. § 357.040;
N.H. Rev. Stat. Ann. § 167-61-b;
N.J. Stat. Ann. § 2A:32C-3;
N.M. Stat. Ann. § 27-14-4 and § 44-9-3;
N.Y. Fin. Law § 189.1(g);
63 Okla. St. Ann. § 5053.1;
R.I. Gen. Laws § 9-1.1-3;
Tenn. Code Ann. § 71-5-182;
Va. Code Ann. § 8.01-216.3;
Wisc. Stat. § 20.931(2); and
D.C. Code Ann. § 2-308.14;

B.    Relators and Plaintiff State of Texas be awarded statutory damages in an amount
equal to two times the amount of actual damages that Texas has sustained as a result
of the Defendants' actions within Texas, as well as the maximum statutory civil
penalty for each violation of Tex. Hum. Res. Code Ann. § 36.052;

C.    Relators be awarded their relators' share of any judgment to the maximum amount
provided pursuant to:

Cal. Govt. Code § 12652(g)(2);
6 Del. C. § 1205;
Fla. Stat. Ann. § 68.085;
Ga. Code. Ann. § 49-4-168.2(i);
Haw. Rev. Stat. § 661-27;
740 Ill. Comp. Stat. § 175/4(d);
Ind. Code § 5-11-5.5-6;
La. Rev. Stat. § 46:439.4;
Mass. Gen. Laws Ch. 12 § 5F;
Mich. Comp. Laws § 400.610a;
Nev. Rev. Stat. Ann. § 357.210;
N.H. Rev. Stat. § 167:61-e;
N.J. Stat. Ann. § 2A:32C-7;
N.M. Stat. Ann. § 27-14-9 and § 44-9-7;

68

N.Y. State Fin. Law § 190.6;
63 Okla. St. Ann. § 5053.4;
R.I. Gen. Laws § 9-1.1-4;
Tenn. Code Ann. § 71-5-183;
Tex. Hum. Res. Code Ann. § 36.110;
Va. Code Ann. § 8.01-216.7;
Wisc. Stat. § 20.931(11); and
D.C. Code Ann. § 2-308.15;

D.     Relators be awarded all costs and expenses associated with each of the pendent State

claims, plus attorney's fees as provided pursuant to:

Cal. Govt. Code § 12652(g)(8);
6 Del. C. § 1205;
Fla. Stat. Ann. § 68.086;
Ga. Code. Ann. § 49-4-168.2(i);
Haw. Rev. Stat. § 661-27;
740 Ill. Comp. Stat. § 175/4(d);
Ind. Code § 5-11-5.5-6;
La. Rev. Stat. § 46:439.4;
Mass. Gen. Laws Ch. 12 § 5F;
Mich. Comp. Laws § 400.610a;
Nev. Rev. Stat. Ann. § 357.180;
N.H. Rev. Stat. § 167:61-e;
N.J. Stat. Ann. § 2A:32C-8;
N.M. Stat. Ann. § 27-14-9 and § 44-9-7;
N.Y. State Fin. Law § 190.7;
63 Okla. St. Ann. § 5053.4;
R.I. Gen. Laws § 9-1.1-4;
Tenn. Code Ann. § 71-5-183;
Tex. Hum. Res. Code Ann. § 36.110;
Va. Code Ann. § 8.01-216.7;
Wisc. Stat. § 20.931(11); and
D.C. Code Ann. § 2-308.15;

E.     Relators and the State Plaintiffs be awarded such other and further relief as the Court

may deem to be just and proper.

69

## JURY DEMAND

Relators hereby demand trial by jury.

STONE & MAGNANINI LLP

David S. Stone
Eric H. Jaso
Jason C. Spiro
Attorneys for Relators
Stone & Magnanini LLP
150 John F. Kennedy Pkwy, Fourth Floor
Short Hills, NJ 07078
(973) 218-1111
dstone@stonemagnalaw.com
ejaso@stonemagnalaw.com
jspiro@stonemagnalaw.com

BOIES, SCHILLER & FLEXNER
LLP
Stephen N. Zack
William A. Isaacson
Matthew W. Friedrich
Attorneys for Relators
(202) 237-2727
5301 Wisconsin Ave. NW
Washington, DC 20015
mfriedrich@bsfllp.com

Dated: January 6, 2011

70